U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 OCT 18 PM 2: 30

CLERK

BY ______
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, NEW ENGLAND CABLE & TELECOMMUNICATIONS ASSOCIATION, and USTELECOM – THE BROADBAND ASSOCIATION, on behalf of their members,

Plaintiffs,

v.

PHILIP B. SCOTT, in his official capacity as the Governor of Vermont; SUSANNE R. YOUNG, in her official capacity as the Secretary of Administration; JOHN J. QUINN III, in his official capacity as the Secretary and Chief Information Officer of the Vermont Agency of Digital Services; and JUNE E. TIERNEY, in her official capacity as the Commissioner of the Vermont Department of Public Service;

Defendants.

Case No. 2:18-cv-167

**COMPLAINT**

Plaintiffs American Cable Association ("ACA"), CTIA – The Wireless Association ("CTIA"), NCTA – The Internet & Television Association ("NCTA"), New England Cable & Telecommunications Association ("NECTA"), and USTelecom – The Broadband Association ("USTelecom," and collectively with ACA, CTIA, NCTA, and NECTA, the "Associations") bring this suit on behalf of their members for declaratory judgment and injunctive relief against Defendant Philip B. Scott, in his official capacity as the Governor of Vermont, Susanne R. Young, in her official capacity as the Secretary of Administration, John J. Quinn III, in his official capacity

as the Secretary and Chief Information Officer of the Vermont Agency of Digital Services, and June E. Tierney, in her official capacity as the Commissioner of the Vermont Department of Public Service (collectively, "Defendants"), stating as follows:

**NATURE OF THE CASE**

1. This case concerns two interrelated attempts by the State of Vermont to unconstitutionally regulate the provision of broadband Internet service. Specifically, Vermont's Senate Bill 289, Ex. 1 ("S. 289"), and Vermont Executive Order No. 2-18, Ex. 2 ("Executive Order"), impose broad obligations that the Federal Communications Commission's ("FCC") 2018 *Restoring Internet Freedom* Order and the federal Communications Act of 1934, as amended (the "Communications Act"), prohibit states from imposing. The Executive Order and S. 289 are therefore preempted under the Supremacy Clause of the United States Constitution. The Executive Order and S. 289 are unconstitutional for the additional reason that they regulate outside the borders of the State of Vermont and burden interstate commerce in violation of the dormant Commerce Clause of the United States Constitution. As the FCC has repeatedly recognized, Internet traffic flows freely between states, making it difficult or impossible for a provider to distinguish traffic moving within Vermont from traffic that crosses state borders. Both the Supremacy Clause and the dormant Commerce Clause protect broadband Internet service providers ("ISPs") from a patchwork of inconsistent regulations that are impossible for them to comply with as a practical matter. The Court should declare that the Executive Order and S. 289 are preempted and unconstitutional, and should permanently enjoin the Defendants from enforcing or giving effect to them.

2. After careful review and deliberation, the FCC recently adopted the 2018 *Restoring Internet Freedom* Order, which established "a calibrated federal regulatory regime" for mass-

market broadband Internet access service ("BIAS") "based on the pro-competitive, deregulatory goals of the 1996 [Telecommunications] Act." *Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd. 311 ¶ 194 (2018) ("2018 Order"); *see also* Notice of Final Rule and Announcement of Effective Date, 83 Fed. Reg. 21,927 (May 11, 2018) (announcing effective date of 2018 Order as June 11, 2018). The 2018 Order protects Internet openness with a regime of transparency and disclosure rather than heavy-handed regulations. Pursuant to that regime, the Associations' members, either on their own or through their Associations, have made public commitments to preserve core principles of Internet openness. *See, e.g.*, 2018 Order ¶ 142 (collecting examples of members' commitments). Those commitments, as the FCC explained, are fully enforceable by the Federal Trade Commission ("FTC") and state attorneys general under federal and state unfair and deceptive trade practices laws (provided they enforce such commitments in a manner consistent with federal law). *See id.* ¶¶ 142, 196, 244; *see also id.* ¶ 242. "Transparency thus leads to openness," *id.* ¶ 245, and the Internet has remained free and open since the adoption of the 2018 Order, just as it was under the longstanding light-touch approach that applied for most of the Internet's history.

3. The 2018 Order also determined that BIAS, like all other broadband Internet services,[1] is an inherently interstate "information service." *Id.* ¶¶ 20, 199. In so doing, the 2018 Order restored the longstanding position that the FCC (on a bipartisan basis) and the courts had adhered to for decades. The 2018 Order thereby reversed a 2015 FCC ruling, *see Protecting and Promoting the Open Internet*, Report and Order on Remand, Declaratory Ruling, and Order, 30

---

[1] This Complaint uses the term "broadband Internet service" to refer to any broadband service that provides access to the Internet and that is offered by an Internet service provider ("ISP"). The term encompasses not only mass-market broadband Internet access services sold to residential and small business customers (which the FCC refers to as "BIAS"), but also enterprise broadband Internet services sold to government agencies and large businesses.

FCC Rcd. 5601 ¶ 431 (2015) ("2015 Order"), that BIAS should be regulated as a common carrier "telecommunications service" under the Communications Act. The 2018 Order similarly restored the FCC's longstanding determination that wireless BIAS is not a "commercial mobile service" under the Communications Act and therefore is statutorily immune from common carrier regulation. 2018 Order ¶ 74. Here, too, the FCC reversed a 2015 ruling, *see* 2015 Order ¶ 388, that mass-market wireless BIAS should be regulated as a common carrier commercial mobile service.

4. Based on the disclosure regime and these statutory classifications, the FCC repealed certain "net neutrality" rules and regulations that were adopted in the 2015 Order and predicated on the classification of BIAS as a common carrier service. The 2015 Order had imposed four basic forms of conduct regulation on the provision of BIAS that are relevant to this case: a no-blocking rule, a no-throttling rule, a no-paid-prioritization rule, and a general "Internet Conduct Standard." The 2018 Order repealed each of these measures based on federal law and policy mandating a light-touch regulatory approach to BIAS. *See* 2018 Order ¶¶ 1-5. The FCC also revised its longstanding "transparency rule" to specifically require ISPs to disclose blocking, throttling, and other practices to protect Internet openness through a policy of disclosure. *Id.* ¶¶ 220-223.

5. In addition to reclassifying (and thereby reestablishing) fixed and mobile BIAS as services statutorily immune from common carrier regulation and repealing the above-described rules and regulations, the 2018 Order included a broadly worded express preemption directive, making clear that the 2018 Order "preempt[s] *any* state or local measures that would effectively impose rules or requirements that [the FCC has] repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for *any aspect* of broadband service" addressed in the 2018 Order. *Id.* ¶ 195 (emphases added). Notably, the primacy of federal law in

this "inherently" "jurisdictionally interstate" context is one of the few points on which the 2018 Order and 2015 Order agree: both decisions "preclude[d] states from imposing obligations on broadband services that are inconsistent with the carefully tailored [federal] regulatory scheme." 2015 Order ¶¶ 431, 433; *see* 2018 Order ¶¶ 194-195, 200.

6. Notwithstanding the 2018 Order's binding legal rulings and clear preemptive effect, the Governor issued the Executive Order and the State enacted S. 289, which, by their own terms, are deliberately intended to replicate the rules the FCC repealed in the 2018 Order and thereby effectively nullify federal law. The Executive Order and S. 289 thus impose pervasive common-carrier net neutrality mandates on an ISP at the moment it signs a service contract with the State. These contracts include agreements with a wide array of State entities, and each of the Associations have members that currently and routinely enter and maintain such contracts with such entities in Vermont. *See* S. 289 §§ 4 (applying to contracts with "agencies of the Executive Branch"), 5 (applying to contracts with "the Legislative Branch"), 6 (applying to contracts with "the Judicial Branch"); E.O. ¶¶ I (applying to "[a]ll State Agency contracts"), I.D. (defining "State Agency" to "include all State agencies, departments, commissions, committees, authorities, divisions, boards or other administrative units of the Executive Branch"). Moreover, the Executive Order goes even further than the FCC's repealed rules. The 2015 Order reclassified and regulated only BIAS, that is, only mass-market broadband Internet access sold to residential and small business customers. But the Executive Order applies not only to ISPs' provision of BIAS, but also to their provision of enterprise Internet access services sold to government agencies and large businesses. Thus, the Executive Order not only imposes the net neutrality obligations that the FCC repealed in the 2018 Order, but also expands those obligations to reach *all* broadband Internet

services offered by ISPs contracting with the State, including those the FCC chose not to subject to such mandates.

7. Vermont's attempts to revive and, indeed, expand a repealed regulatory regime are plainly preempted by federal law—an outcome that, as discussed below, members of the Vermont government specifically brought to the attention of the Vermont General Assembly and the Governor before they adopted these measures, but that they disregarded in moving forward with these actions. Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, state measures that contravene validly adopted federal laws and policy determinations, including those contained in FCC orders, are preempted and have no force or effect. Here, that preemption applies for at least two distinct reasons.

8. First, the 2018 Order expressly preempts Executive Order and S. 289. Given the inherently interstate nature of BIAS, the FCC has consistently determined that BIAS must be governed "by a uniform set of federal regulations, rather than by a patchwork that includes separate state and local requirements." 2018 Order ¶ 194; *see also* 2015 Order ¶ 433 (ruling that BIAS must remain subject to "a comprehensive regulatory framework" at the national level that "preclude[s] states from imposing obligations on broadband service that are inconsistent with the [FCC's] carefully tailored regulatory scheme"). Disparate state and local requirements could "significantly disrupt the balance" struck by federal law and "impair the provision of [BIAS] by requiring each ISP to comply with a patchwork of separate and potentially conflicting requirements across all the different jurisdictions in which it operates." 2018 Order ¶ 194. This is already happening—several states have adopted or are in the process of adopting different and potentially incongruous net neutrality requirements, which are consistent only in their disregard for the primacy of federal law. And given the ambiguity inherent in many of the requirements, state

agencies and courts inevitably will interpret these requirements differently and further perpetuate their incongruity. The FCC expressly found that such state and local efforts to regulate in this area "could pose an obstacle to or place an undue burden on the provision of broadband Internet access service and conflict with the deregulatory approach" adopted in the 2018 Order. *Id.* ¶ 195. The Executive Order and S. 289 unquestionably constitute state measures that "impose rules or requirements that [the FCC has] repealed or decided to refrain from imposing" and thus are expressly preempted by federal law. *Id.* They likewise stand as an obstacle to the federal policy of reducing regulation of BIAS and thus are invalid under conflict preemption principles and precedent as well.

9. Second, the Communications Act itself also preempts the Executive Order and S. 289 because they impose impermissible common carrier regulations—that is, categorical bans affecting how providers offer service that leave "no room at all for individualized bargaining." *Verizon v. FCC*, 740 F.3d 623, 658 (D.C. Cir. 2014). The Communications Act expressly prohibits the imposition of common carrier obligations on providers of information services and on providers of private mobile services. *See id.* at 650 (citing 47 U.S.C. §§ 153(51), 332(c)(1)(A)).[2] That is why, prior to the 2015 Order, the D.C. Circuit invalidated some of the same requirements that Vermont seeks to impose here when the FCC applied them to such non-common-carrier services. *See Verizon*, 740 F.3d at 650. It is also why the FCC's adoption of these and other requirements in its now-rescinded 2015 Order was predicated on classifying BIAS as a common carrier telecommunications service. *See* 2015 Order ¶¶ 307-308. That predicate no longer applies because the 2018 Order restored the longstanding classification of BIAS as an information service,

[2] "Private mobile services" are those mobile services that are not "commercial mobile radio services" as defined by the Communications Act and the FCC. 47 U.S.C. § 332(d).

and of mobile BIAS as a private mobile service. As the Eighth Circuit recently reiterated, "'any state regulation of an information service conflicts with the federal policy of nonregulation,' so that such regulation is preempted by federal law." *Charter Advanced Servs. (MN), LLC v. Lange*, --- F.3d ---, No. 17-2290, 2018 WL 4260322, at *2 (8th Cir. Sept. 7, 2018) (quoting *Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 580 (8th Cir. 2007)). Thus, the Executive Order and S. 289 impermissibly impose common carrier regulations on services that are statutorily exempt from such regulation. The Executive Order further conflicts with the FCC's determinations in prior orders—which the 2015 Order did not alter—that all other broadband Internet services (such as those sold to government agencies and large business customers) are information services and, when offered by wireless ISPs, are also private mobile services. *See* 2015 Order ¶¶ 189-190.

10. The State cannot escape the preemptive force of the 2018 Order and federal law more broadly by claiming that it is merely exercising its spending power like any private market participant. The Executive Order and S. 289 expressly regulate ISPs' provision of service to *all* customers throughout the State, not just to government customers and contracts. Controlling judicial precedent holds that states may not escape federal preemption by regulating indirectly through their spending, procurement, or other commercial powers what they are forbidden from regulating directly. Indeed, if states *were* permitted to circumvent federal preemption in this manner, they would have a free hand to use their spending powers to undermine established federal law on virtually any topic—including civil rights, religious freedom, and a variety of other issues. Thus, this Court should declare the Executive Order and S. 289 unconstitutional under the Supremacy Clause of the United States Constitution and enjoin Defendants from enforcing or giving effect to the Executive Order and S. 289.

11. Finally, the Executive Order and S. 289 violate the "dormant" or "negative" Commerce Clause of the United States Constitution by regulating conduct occurring wholly outside Vermont's borders. Specifically, the Executive Order and S. 289 regulate Internet services that involve overwhelmingly interstate communications, which the FCC has found cannot practically be separated from rare instances of purely intrastate electronic communications. Moreover, the Executive Order, on its face, is not limited to ISPs' dealings with Vermont customers. The Executive Order and S. 289 also violate the "dormant" or "negative" Commerce Clause because they impose burdens on interstate commerce that far outweigh any purported benefits to Vermont by re-imposing rules that the FCC expressly found to harm interstate commerce and to offer no net benefits.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Associations' claims arise under the laws of the United States, including the Communications Act, the 2018 Order, 42 U.S.C. § 1983, and the Supremacy and Commerce Clauses of the United States Constitution. This Court has equitable jurisdiction to enjoin unconstitutional action. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

13. Because an actual controversy within the Court's jurisdiction exists, this Court may grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

14. Venue is proper in the District of Vermont, pursuant to 28 U.S.C. § 1391(b), because the events and omissions giving rise to the Associations' claims occurred in Vermont.

**PARTIES**

15. Plaintiff ACA is a trade association of small and medium-sized cable companies in the United States. Many of ACA's members are small, family-owned businesses that have served their communities for decades. Multiple ACA members offer broadband Internet services to households, businesses, and governmental entities in Vermont.

16. Plaintiff CTIA is a non-profit association that represents the wireless communications industry. Members of CTIA include wireless broadband ISPs operating in the State of Vermont and throughout the county, as well as providers of other wireless services, device manufacturers, and other wireless industry participants.

17. Plaintiff NCTA is the principal national trade association of the cable industry in the United States. Its members include cable providers offering broadband Internet services to households, businesses, and governmental entities throughout the country, including in Vermont.

18. Plaintiff NECTA is a regional trade association representing cable providers in Vermont, Connecticut, Massachusetts, New Hampshire, and Rhode Island. Several of NECTA's members offer broadband Internet services to households, businesses, and governmental entities throughout that five-state region, including Vermont.

19. Plaintiff USTelecom is a non-profit association of service providers and suppliers for the telecommunications industry. Its members provide broadband Internet services, including BIAS and new Internet Protocol-based services over fiber-rich networks, to millions of consumers and businesses across the country, including in Vermont.

20. The Associations have standing to bring the claims asserted in this Complaint on behalf of their members because (a) the subject matter of this suit is germane to the Associations' purpose; (b) members of the Associations would have standing on their own to bring these claims,

given the substantial harms that members face if the invalid and unconstitutional state measure at issue here were to be enforced; and (c) neither the claims asserted, nor the relief requested, requires the participation of the Associations' individual members in this lawsuit.

21. Defendant Philip B. Scott is the Governor of Vermont. Pursuant to Chapter II, Section 20 of the Vermont Constitution, the Governor is vested with the chief executive power of the State and is "to take care that the laws be faithfully executed." Defendant Scott signed and issued Executive Order 2-18, which is one subject of this action. He is also ultimately responsible for enforcing S. 289. He is the head of the State of Vermont's executive branch, to which both the Executive Order and S. 289 apply. He is sued in his official capacity only.

22. Defendant Susanne R. Young is the Secretary of Administration of the State of Vermont. Pursuant to ¶¶ II, III, and IV of the Executive Order, she, and the agency she heads, are responsible for implementing the Executive Order by amending the State's Procurement and Contracting Procedures to comport with the Executive Order, granting any waivers from compliance with the Executive Order, and granting approval to State agencies to procure Internet services in compliance with the Executive Order. Pursuant to §§ 2, 4, 5, 6, and 7 of S. 289, she also manages the process whereby ISPs certify that they meet S. 289's requirements, and such certification is required to contract with the State of Vermont. She is sued in her official capacity only.

23. Defendant John J. Quinn III is the Secretary and Chief Information Officer of the Vermont Agency of Digital Services. Pursuant to ¶¶ IV and V of the Executive Order, he, and the agency he heads, are responsible for implementing the Executive Order by granting approval to State agencies to procure Internet services in compliance with the Executive Order and advising the Governor on additional actions to further the purposes of the Executive Order. Pursuant to § 4

of S. 289, the agency he heads is responsible for ensuring that contracts with State entities contain terms and conditions requiring that an ISP certify its compliance with S. 289. He is sued in his official capacity only.

24. Defendant June E. Tierney is the Commissioner of the Vermont Department of Public Service. Pursuant to ¶¶ III and V of the Executive Order, she, and the agency she heads, are responsible for implementing the Executive Order by "resolv[ing] any dispute over the definition of terminology used in [the] Executive Order" and advising the Governor on additional actions to further the purposes of the Executive Order. She is sued in her official capacity only.

## STATEMENT OF FACTS

### *The Associations' Members*

25. The Associations' members provide broadband Internet services in Vermont, including both mass-market and enterprise broadband Internet services. Those members also provide broadband Internet services to government entities in Vermont, and either have bid (since the effective date of the Executive Order) or intend to bid on contracts with State entities to provide such services in the future.

26. These members provide broadband Internet services in Vermont (and throughout the country) using extensive wired and wireless networks that enable the routing of data packets along dynamic paths without regard for state or even national boundaries. It is "well-settled" that the broadband Internet services the Associations' members offer are "jurisdictionally interstate service[s] because 'a substantial portion of Internet traffic involves accessing interstate or foreign websites.'" 2018 Order ¶ 199 (quoting *Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 5 (D.C. Cir. 2000)); *see also id.* ¶¶ 199-200 (collecting cites to extensive prior FCC and judicial precedent in support). "Because both interstate and intrastate communications can travel over the same Internet

connection (and indeed may do so in response to a single query from a consumer), it is impossible or impracticable for ISPs to distinguish between intrastate and interstate communications over the Internet or to apply different rules in each circumstance." *Id.* ¶ 200.

***Federal Law Governing Broadband Internet Service***

27. The provision of broadband Internet service in general—and the issue of net neutrality in particular—have long been the focus of substantial regulatory interest and activity at the federal level. That is as it should be, given the inherently interstate nature of Internet service. For many years before 2015, the FCC repeatedly made clear that broadband Internet service is properly classified as an interstate information service free from common-carrier-style regulation. *See, e.g.*, *In re GTE Telephone Operating Cos.*, Memorandum Opinion and Order, 13 FCC Rcd. 22466 ¶¶ 16-19 (1998); *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd. 4798 ¶¶ 38-39 (2002); *Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, Report and Order and Notice of Proposed Rulemaking, 20 FCC Rcd. 14853 ¶ 12 (2005); *United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband Over Power Line Internet Access Service as an Information Service*, Memorandum Opinion and Order, 21 FCC Rcd. 13281 (2006); *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, Declaratory Ruling, 22 FCC Rcd. 5901 (2007); *see also National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1003 (2005) (upholding the FCC's 2002 determination that broadband Internet access service is an information service).

28. **The 2015 Order.** In 2015, the FCC temporarily deviated from that longstanding classification of BIAS as an information service when it adopted the 2015 Order, which

reclassified only "mass-market retail" BIAS—but *not* enterprise broadband Internet services sold to government agencies and large business customers—as an interstate "telecommunications service." 2015 Order ¶¶ 25, 189. The FCC simultaneously reclassified mobile "mass-market retail" BIAS—and, again, *not* other mobile broadband Internet services, such as those sold to government agencies and enterprise customers—as a "commercial mobile service." With these changes to then-existing law, the FCC was able to subject mass-market fixed and mobile BIAS to common carrier regulation. Exercising that newly created authority, it did just that, adopting a set of net neutrality regulations governing BIAS providers. The regulations included the following three so-called "bright-line" rules:

- No blocking: "A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not block lawful content, applications, services, or nonharmful devices, subject to reasonable network management." 2015 Order ¶ 15.
- No throttling: "A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not impair or degrade lawful Internet traffic on the basis of Internet content, application, or service, or use of a non-harmful device, subject to reasonable network management." *Id.* ¶ 16.
- No paid prioritization: "A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not engage in paid prioritization. 'Paid prioritization' refers to the management of a broadband provider's network to directly or indirectly favor some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (a) in

exchange for consideration (monetary or otherwise) from a third party, or (b) to benefit an affiliated entity." *Id.* ¶ 18.

29. The FCC also adopted a general "Internet Conduct Standard," which stated: "Any person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not unreasonably interfere with or unreasonably disadvantage (i) end users' ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of their choice, or (ii) edge providers' ability to make lawful content, applications, services, or devices available to end users. Reasonable network management shall not be considered a violation of this rule." *Id.* ¶ 21. The 2015 Order expressly acknowledged that the Internet Conduct Standard, together with the bright-line rules noted above, constituted common carrier regulation. *Id.* ¶¶ 288-96.

30. The FCC supplemented these common carrier regulations with rules intended to ensure that Internet access service providers are transparent about their network management practices and terms of service. To that end, the 2015 Order left in place transparency requirements first adopted in 2010, though the FCC added certain non-codified "enhancements" to the requirements. *See id.* ¶ 23 ("A person engaged in the provision of broadband Internet access service shall publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of such services and for content, application, service, and device providers to develop, market, and maintain Internet offerings."); *id.* ¶ 24 (describing the enhancements).

31. **The 2018 Order.** In 2017, the FCC reexamined this departure from its historical approach to the Internet and adopted the 2018 Order, which restored the pre-2015 classification of

BIAS as an interstate "information service," as well as the pre-2015 classification of mobile BIAS as a "private mobile service." Relying on both the Communications Act, which precludes subjecting these services to common carrier regulation, and an in-depth analysis of the public interest, it repealed the so-called bright-line rules in the 2015 Order on blocking, throttling, and paid prioritization, as well as the Internet Conduct Standard. *See* 2018 Order ¶¶ 239, 246-267. In lieu of these requirements, the 2018 Order revised the transparency rule to expressly require that BIAS providers publicly and clearly disclose any blocking, throttling, paid prioritization, or affiliated prioritization. *Id.* ¶ 220. The FCC preserved the core requirement that ISPs disclose key terms relating to broadband performance, commercial terms, and network management, *see id.* ¶ 115, while rescinding certain "enhancements" that the 2015 Order had imposed, such as the requirement that most ISPs disclose highly technical performance characteristics, which the FCC determined would not be useful to consumers, *see id.* ¶¶ 214-215, 221-222.

32. The FCC further determined that the FTC has both the authority and capability to "enforce any commitments made by ISPs regarding their network management practices," including the net neutrality commitments the Associations and their members had made publicly. *Id.* ¶ 141 (citing 15 U.S.C. § 45(a)). It further noted that federal antitrust laws, enforceable by both the FTC and Department of Justice, provide additional protections. *See id.* ¶ 143. Thus, the FCC concluded that "the [revised] transparency rule," "in combination with the state of broadband Internet access service competition and the antitrust and consumer protection laws, obviates the need for conduct rules by achieving comparable benefits at lower cost." *Id.* ¶ 239.

33. The 2018 Order further reaffirmed the FCC's longstanding (and bipartisan) determination that broadband Internet service is inherently interstate and must be governed by "a uniform set of federal regulations, rather than by a patchwork that includes separate state and local

requirements." 2018 Order ¶ 194. Indeed, the FCC has long confirmed its "preemption authority to preclude states from imposing obligations on broadband service that are inconsistent with the [FCC's] carefully tailored regulatory scheme." 2015 Order ¶ 433. Federal courts have likewise affirmed that broadband Internet service is an "'interstate and foreign communication by wire' within the meaning of Title I of the Communications Act," *Comcast Corp. v. FCC*, 600 F.3d 642, 646-47 (D.C. Cir. 2010) (quoting 47 U.S.C. § 152(a)), thereby subject to the "centraliz[ed] authority" of the FCC, 47 U.S.C. § 151.

34. Building on its long-held position, the FCC explained in the 2018 Order that it was establishing "a calibrated federal regulatory regime [for broadband] based on the pro-competitive, deregulatory goals of the 1996 Act." 2018 Order ¶ 194. Allowing state and local governments to adopt their own separate, and more burdensome, requirements for broadband service, the FCC explained, could "significantly disrupt the balance" struck by federal law and "could impair the provision of such service by requiring each ISP to comply with a patchwork of separate and potentially conflicting requirements across all the different jurisdictions in which it operates." *Id.*

35. Accordingly, and central to this suit, the FCC included a broadly worded, express preemption provision in the 2018 Order. That provision states that the 2018 Order "preempt[s] *any* state or local measures that would effectively impose rules or requirements that [the FCC has] repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for *any aspect* of broadband service" addressed in that order, 2018 Order ¶ 195 (emphases added), "includ[ing] any state laws that would require the disclosure of [BIAS] performance information, commercial terms, or network management practices in any way inconsistent with the transparency rule adopted" by the 2018 Order, *id.* ¶ 195 n.729. This preemption is necessary, the FCC explained, because state efforts to regulate in this area "could

pose an obstacle to or place an undue burden on the provision of broadband Internet access service and conflict with the deregulatory approach" adopted in the 2018 Order. *Id.* Indeed, even the 2015 Order determined "that broadband Internet access service is jurisdictionally interstate for regulatory purposes," 2015 Order ¶ 431—as the 2018 Order reaffirmed, *see* 2018 Order ¶ 199—and admonished states not to "frustrate federal broadband policies," 2015 Order ¶ 433.

36. The 2018 Order carries the weight of the Supremacy Clause. The Supreme Court has long recognized that "[f]ederal regulations have no less pre-emptive effect than federal statutes," *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982), and that "a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law," *City of New York v. FCC*, 486 U.S. 57, 63-64 (1988) (internal quotation marks omitted). Moreover, a federal determination that an area is best left "*un*regulated" carries "as much pre-emptive force as a decision *to* regulate." *Ark. Elec. Co-op. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983) (emphasis in original); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883-84 (2000) (federal determination that statutory objectives, including promoting innovation, were best achieved through less rather than more regulation constituted a substantive determination with preemptive force); *Minn. Pub. Utils. Comm'n. v. FCC*, 483 F.3d 570, 580 (8th Cir. 2007) (recognizing that "deregulation" is a "valid federal interest[] the FCC may protect through preemption of state regulation"). States thus must respect, and not flout, the 2018 Order's policy determinations regarding the proper regulatory status of BIAS and its preemption provision, just like any other federal law.

***Executive Order No. 2-18***

37. On February 15, 2018, Governor Scott signed Vermont Executive Order No. 2-18, which provides that "[a]ll State Agency contracts with Internet service providers shall include net neutrality protections, and specifically state that Internet service providers shall not" engage in blocking, throttling, or paid prioritization, using language substantially similar to the 2015 Order rules that the FCC repealed in the 2018 Order. E.O. ¶¶ I.A-I.C. The Executive Order also requires that all State agency contracts for broadband Internet services include a provision that replicates, almost verbatim, the "Internet Conduct Standard" repealed by the 2018 Order. *Id.* ¶ I.D. In fact, the Executive Order appears to impose a broader version of the Internet Conduct Standard than the 2015 Order, which provided that "[r]easonable network management shall not be considered a violation," 2015 Order ¶ 136—an exception the Executive Order lacks, *see* E.O. ¶ I.D. Additionally, whereas the 2015 Order identified a set of "factors" to guide the application of the Internet Conduct Standard, *see* 2015 Order ¶¶ 138-145, the Executive Order omits those factors and provides no indication of how the State intends to apply the standard, *see* E.O. ¶ I.D.

38. In his press statement accompanying the signing of the Executive Order, Governor Scott made clear that the Executive Order is intended to reinstate the net neutrality regulations that the FCC repealed: "I did not support the Federal Communications Commission's decision to repeal net neutrality, but we can take steps here in Vermont to uphold these values." *Governor Signs Order to Protect Net Neutrality, Legislators Say It Doesn't Do Enough*, ST. ALBANS MESSENGER, Feb. 16, 2018, at A5.

39. The restrictions the Executive Order imposes are not limited to an ISP's provision of broadband Internet service pursuant to a specific government contract, but instead require that ISPs comply with the Executive Order's net neutrality requirements in the provision of all "Internet

services" to "any Internet customer." *See, e.g.*, E.O. ¶ I.C; *see also id.* ¶¶ I.A, I.B, I.D (applying conditions to the provision of service to "customers" in general, without limiting the conditions to government customers); *id.*, pmbl. (reciting a desire to ensure an open Internet for "Vermonters" generally).

40. The Executive Order became effective upon its signing. E.O. ¶ VII. The Executive Order also provided that "[a]s soon as practicable, but in no event later than April 1, 2018, the Agency of Administration shall amend the State's Procurement and Contracting Procedures as necessary and appropriate to comply with this directive." *Id.* ¶ II. The Agency of Administration released such amendments on March 29, 2018, specifically requiring that "[t]he language set forth in Executive Order No. 2-18 must be included in all state contracts with Internet service providers." State of Vermont, *Information Technology Procurement Guideline* at 42-43 (rev. Mar. 29, 2018), *available at* http://bit.ly/2JcFyL4.

***S. 289***

41. On May 12, 2018, the Vermont General Assembly passed S. 289, and on May 22, 2018, the Governor signed S. 289 into law. Similar to the Executive Order, S. 289 imposes net neutrality requirements on ISPs as a condition of obtaining State contracts for the provision of BIAS. *See* S. 289 §§ 3-7. In a letter to legislators following his signing of S. 289, Governor Scott stated that S. 289 "solidifies the State's policy interest" that was "previously addressed in the Executive Order [he] issued in February." Letter from Vermont Gov. Philip B. Scott to Vermont General Assembly, May 22, 2018, at 1, Ex. 3 ("Scott Letter").

42. Specifically, under S. 289, the Secretary of Administration must develop a process for ISPs to certify that they meet "net neutrality standards" that are nearly identical to those in the now-repealed 2015 Order. *See* S. 289 § 2. To receive a "certificate of net neutrality compliance,"

the ISP must "demonstrate[]" to the Secretary that, among other things, it does not engage in blocking, throttling, or paid prioritization in Vermont, and that it adheres to a standard that replicates the FCC's repealed Internet Conduct Standard. *See id.* Additionally, to receive certification, the ISP must publicly disclose to consumers information regarding its "network management practices, performance, and commercial terms of its broadband Internet access services." *Id.* An ISP may contract with State entities only if the contract "contains terms and conditions requiring that the Internet service provider certify that it is in compliance with . . . [these] net neutrality standards." *Id.* §§ 3-6. Notably, S. 289 goes further in this respect than the Executive Order, as S. 289 imposes those conditions not only on contracts with State agencies under the Executive Branch, but also on contracts with the Legislative and Judicial Branches. *Compare id.* §§ 4 (applying to contracts with "agencies of the Executive Branch"), 5 (applying to contracts with "the Legislative Branch"), 6 (applying to contracts with "the Judicial Branch"), *with* E.O. ¶¶ I (applying to "[a]ll State Agency contracts"), I.D. (defining "State Agency contracts" as those under the Executive Branch).

43. As with the Executive Order, S. 289 imposes restrictions and requirements that are not limited to an ISP's provision of service pursuant to a particular government contract. Instead, to receive certification, the ISP must demonstrate that it "does not engage in any of [S. 289's prohibited practices] *in Vermont*." S. 289 § 2 (emphasis added). Thus, in order to contract with the State of Vermont, an ISP must comply with S. 289's requirements when providing service to any customer in Vermont—not just when serving a government customer.

44. S. 289 became effective on July 1, 2018. *Id.* § 7. Its requirements "apply to all government contracts for Internet service entered into or renewed on or after either April 15, 2019

or the date on which the Governor's Executive Order No. 2-18 [] is revoked and rescinded, whichever is earlier." *Id.* A challenge to both measures is proper now.

***Executive Order No. 2-18 and S. 289 Are Preempted***

45. The admitted purpose and effect of the Executive Order and S. 289 is to reinstate the rules and policies the FCC had adopted in the 2015 Order but repealed in the 2018 Order. The Executive Order specifically asserts that "the Federal Communications Commission (FCC) recently issued its order, '*Restoring Internet Freedom*' which eliminated net neutrality principles," E.O. pmbl., and that the Executive Order is designed to reverse that federal action by mandating that "[a]ll State Agency contracts with Internet service providers shall include net neutrality protections," *id.* ¶ I. Similarly, the "findings" set forth in § 1 of S. 289 acknowledge that "[t]he Federal Communications Commission's (FCC's) recent repeal of the federal net neutrality rules pursuant to its Restoring Internet Freedom Order manifests a fundamental shift in policy" based on the FCC's determination that "a 'light-touch' regulatory approach under Title I of the Communications Act of 1934, rather than 'utility-style' regulation under Title II, will further advance the [c]ongressional goals of promoting broadband deployment and infrastructure investment." S. 289 § 1(9). But the findings go on to claim, without pointing to any evidence, that "[t]he FCC's regulatory approach is unlikely to achieve the intended results in Vermont," and attempt to rationalize the enactment of the statute on that basis. *Id.* § 1(10). Thus, the General Assembly explicitly rejected the 2018 Order's policies in favor of conflicting policies that the 2018 Order repealed.

46. Accordingly, the Executive Order and S. 289 are the very kind of state measures that the 2018 Order and the Communications Act each preempt. As noted above, the 2018 Order "preempt[s] *any* state or local measures that would effectively impose rules or requirements that

[the FCC has] repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for *any aspect* of broadband service" addressed in the 2018 Order. 2018 Order ¶ 195 (emphases added). The 2018 Order's preemption of "state or local measures" plainly covers the Executive Order and S. 289, which both seek to reinstate net neutrality requirements that the 2018 Order repealed, as well as "more stringent" versions of those requirements, and thus explicitly "impose [net neutrality] requirements" on ISPs in their provision of BIAS. *Id.* The "rules or requirements that [the FCC] repealed" in the 2018 Order include the prior no-blocking rule, no-throttling rule, no-paid-prioritization rule, and the Internet Conduct Standard. The Executive Order and S. 289 reinstate all of these repealed rules for ISPs that contract with the State.[3]

47. In fact, the Executive Order goes even further than the repealed federal rules by applying the requirements more stringently to all "Internet service providers" and all "Internet services," including those sold to government and enterprise customers, E.O. pmbl, ¶ 1, rather than limiting its reach only to the providers of the mass-market services that the FCC had decided to regulate in the 2015 Order. *See* 2015 Order ¶¶ 25-26 (defining BIAS to exclude providers of enterprise services and similar offerings); *id.* ¶¶ 15, 16, 18, 21 (applying prior federal net neutrality

---

[3] S. 289 also includes a disclosure requirement that differs from the 2018 Order's revised transparency rule. *Compare* 2018 Order ¶ 215 (requiring disclosure of "accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient to enable consumers to make informed choices regarding the purchase and use of such services and entrepreneurs and other small businesses to develop, market, and maintain Internet offerings"), *with* S. 289 § 2 (requiring that disclosures also be sufficient "for content, application, service, and device providers to develop, market, and maintain Internet offerings"). This requirement is preempted as well, as the 2018 Order specifically preempts "any state laws that would require the disclosure of broadband Internet access service performance information, commercial terms, or network management practices in any way inconsistent with the transparency rule we adopt herein." 2018 Order ¶ 195 n.729. Indeed, Vermont would have had no reason to enact S. 289's disclosure requirement if the intent were merely to replicate the FCC's existing transparency rule.

rules to BIAS providers only "insofar as such person is . . . engaged" in the provision of BIAS). By the same token, the Executive Order also goes beyond the 2015 Order by requiring all ISPs that contract with State agencies to comply with the net neutrality rules in their dealings with "any Internet customer," E.O. ¶ I.C—not merely with the mass-market customers that were the subject of the FCC's rules in the 2015 Order.

48. Even apart from the 2018 Order's express preemption ruling, the Executive Order and S. 289 stand as obstacles to the federal policy of reducing regulation of broadband Internet service by re-imposing the regulations the FCC repealed and by extending them to broadband Internet services that the FCC had intentionally never subjected to its net neutrality rules. *See, e.g.*, *City of New York v. FCC*, 486 U.S. 57, 64 (1988) ("The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof."); *Ark. Elec. Co-op.*, 461 U.S. at 384 (a federal determination that the area is best left "*un*regulated" carries "as much pre-emptive force as a decision *to* regulate") (emphasis in original). To take one example, both the Executive Order and S. 289 re-impose the FCC's repealed Internet Conduct Standard—which the 2018 Order found had "hindered investment and innovation." 2018 Order ¶ 247; *see* E.O. ¶ I.D; S. 289 § 2. What is more, the Executive Order *expands* the FCC's Internet Conduct Standard by omitting the FCC's exception for "reasonable network management." *See* E.O. ¶ I.D. These measures blatantly flout the FCC's federal policy determination and harm broadband providers and consumers both by constraining the development of innovative new services and by subjecting ISPs to a patchwork of complex, burdensome, and inconsistent regulation.

49. The Executive Order and S. 289 also are flatly inconsistent with, and stand as obstacles to, Congress's statutory prohibition in the Communications Act on imposing common

carrier regulation on broadband providers except "to the extent" that they provide a "telecommunication service" or, in the case of wireless providers, a "commercial mobile service." 47 U.S.C. §§ 153(51), 332(c)(1)(A). The FCC determined in the 2018 Order that BIAS is an information service, not a telecommunications service. 2018 Order ¶ 239. The FCC also determined that wireless BIAS is a private mobile service, not a commercial mobile service. *Id.* In so doing, the FCC further held that these classifications best achieve federal policies of "encouraging broadband investment and innovation, making broadband available to all Americans and benefitting the entire Internet ecosystem." 2018 Order ¶¶ 74, 86.

50. Because broadband Internet service is an information service rather than a telecommunications service, broadband providers are exempt from common carrier regulation under federal law. *See Verizon*, 740 F.3d at 650 (finding it "obvious that the Commission would violate the Communications Act were it to regulate broadband providers as common carriers," given the Commission's decision to "classify broadband providers . . . as providers of 'information services'"); *id.* (finding that, "because the Commission has classified mobile broadband service as a 'private' mobile service . . . , treatment of mobile broadband providers as common carriers would violate section 332"). And, because wireless broadband Internet service is a private mobile service, rather than a commercial mobile service, wireless broadband providers are doubly exempt from common carrier regulation. *See Cellco P'ship v. FCC*, 700 F.3d 534, 538 (D.C. Cir. 2012).

51. As explained above, the D.C. Circuit previously struck down the FCC's nearly identical, pre-2015 net neutrality rules precisely because they imposed common carrier requirements on providers that are exempt from such regulation. *See id.* at 657-68 (holding that a net neutrality regime that includes flat bans on blocking and paid prioritization and thus "leaves no room at all for individualized bargaining" constitutes impermissible common carrier regulation

of information service providers (internal quotations marks and citations omitted)). Even the prohibition on unreasonable interference "mirrors" statutory language "establishing the basic common carrier obligation not to 'make any unjust or unreasonable discrimination.'" *Id.* at 657 (quoting 47 U.S.C. § 202). By imposing common carrier regulation on both information services and private mobile services, the Executive Order and S. 289 interfere with the federal policies expressed in the 2018 Order and violate specific provisions of the Communications Act, and are therefore preempted on both grounds. *See Charter Advanced Servs.*, 2018 WL 4260322, at *2 ("[A]ny state regulation of an information service conflicts with the federal policy of nonregulation, so that such regulation is preempted by federal law." (internal quotation marks and citation omitted)).

52. In fact, since the adoption of the Executive Order and the enactment of S. 289, the Vermont Public Utility Commission ("Vermont PUC"), the state agency responsible for regulating certain intrastate communications services in Vermont, has recognized the preemptive force of the 2018 Order. In a June 2018 decision, the Vermont PUC held that it was "preempted from asserting jurisdiction" over a dispute involving an ISP's BIAS offering—high-speed Internet access over digital subscriber line ("DSL") service—because it is "not subject to state jurisdiction" in light of "the FCC's classification of broadband services such as DSL as information services." *Petition of Vanu Coverage Co.*, Case No. 18-1543-PET, Order Dismissing Petition Without Prejudice for Lack of Jurisdiction, at 6-7 (Vt. Pub. Util. Comm'n Jun. 18, 2018). The Vermont PUC also specifically pointed to the FCC's policy determination that "allowing state or local regulation of broadband Internet access service could impair the provision of such service by requiring each [Internet Service Provider] to comply with a patchwork of separate and potentially conflicting

requirements across all of the different jurisdictions in which it operates." *Id.* at 6 (quoting 2018 Order ¶ 194).

53. Moreover, Defendants and their agencies themselves voiced serious legal concerns about state-specific net neutrality conditions prior to the adoption of these measures. When the Vermont General Assembly was considering S. 289, the Vermont Public Service Department "strongly caution[ed]" against such legislation because it "would likely run afoul of the preemption provisions" in the 2018 Order and warned that "a federal court is likely to be highly skeptical [of] and disinclined to uphold any law that directly or indirectly seeks to legislate or regulate net neutrality." Ex. 4, Mem. from Pub. Serv. Dep't to Kendal Smith. Similarly, Defendants Young and Quinn expressed their concerns regarding S. 289 and cautioned the Vermont Senate that the 2018 Order "made clear that the new rules preempt *any state attempts* to regulate [I]nternet traffic." Ex. 5, Mem. from Young et al. to Sen. Committee on Finance (emphasis added). Even Governor Scott himself, in a letter to legislators written at the same time he signed S. 289, pointed to "federal preemption of state laws in this area" and acknowledged that "this legislation"—that is, S. 289—"may have to be modified to mitigate the risk of expensive litigation." Ex. 3, Scott Letter at 1.

54. These Defendants were correct—both in acknowledging the 2018 Order's controlling preemption ruling and in recognizing that it covers state efforts to impose net neutrality obligations in the form of procurement conditions. Supreme Court precedent makes clear that a state cannot use its spending power as a means to regulate indirectly what it cannot regulate directly. *See Chamber of Commerce v. Brown*, 554 U.S. 60, 69 (2008) (when a state cannot "directly regulate" activity that is preempted by federal law, "[i]t is equally clear that [the state] may not indirectly regulate such conduct by imposing restrictions on the use of state funds"). Nor can Defendants claim that the Executive Order and S. 289 avoid preemption here because the State

of Vermont is acting as a market participant and not a regulator. *Wisconsin Dep't of Indus. v. Gould, Inc.*, 475 U.S. 282, 287 (1986) (rejecting the state's argument that its statutory scheme "escapes pre-emption because it is an exercise of the state's spending power rather than its regulatory power"). While a state generally is free to specify the characteristics of the products and services it purchases for its *own* use, Supreme Court precedent draws a controlling distinction between the role of the state as "market participant" and as regulator. Specifically, the Supreme Court's cases instruct that the market participant exception does *not* apply where the challenged action, "for all practical purposes, . . . is tantamount to regulation." *Id.* at 289. A state acts as a regulator, and not as a market participant, when the state measure at issue "is neither 'specifically tailored to one particular job' nor a 'legitimate response to state procurement constraints or to local economic needs.'" *Brown*, 554 U.S. at 70. That is plainly the case here.

55. Indeed, case law establishes that substance, not form, matters for the market-participant inquiry, and that a state that seeks to regulate conduct outside the scope of state contracts cannot fall within the market participant exception. *Compare Gould*, 475 U.S. at 288 (holding that a state policy forbidding state contracts with three-time National Labor Relations Act violators was preempted because it sought to penalize contractors for conduct outside the scope of the state contract), *with Bldg. & Const. Trades Council of the Metro. Dist. v. Associated Bldrs. & Contractors of Mass./R.I. Inc.*, 507 U.S. 218, 232 (1993) (upholding a condition in a contract between a state agency and a contractor that was "specifically tailored to one particular job" and aimed at ensuring "an efficient project that would be completed as quickly and effectively as possible at the lowest cost"); *see also Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 189 n.2 (2d Cir. 2012) ("Extracontractual effect is an indicator of regulatory rather than proprietary intent . . . ."). The Second Circuit has applied this precise framing to preemption

claims arising under the Communications Act and the FCC's implementing rules and orders. *See Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 416 (2d Cir. 2002) (applying *Gould* to preemption analysis under the Communications Act and FCC orders and rules). Contrary to these precedents, the Executive Order and S. 289 explicitly aim to regulate ISP conduct *generally* in order to require adherence to net neutrality principles throughout the State, by purporting to regulate services provided to *all* consumers in Vermont. They are plainly preempted.

***Executive Order No. 2-18 and S. 289 Violate the Dormant Commerce Clause***

56. The Executive Order and S. 289 independently violate the Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3, both because they regulate "commerce occurring wholly outside the boundaries of [Vermont]," *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989), and because they impose burdens on interstate commerce that outweigh any purported local benefit, *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 146 (1970). Under the "dormant" or "negative" Commerce Clause, a state may not "discriminate against or burden the interstate flow of articles of commerce," *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 98 (1994), or "'erect barriers against interstate trade,'" *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980)). The Executive Order and S. 289 plainly violate these core constitutional principles.

57. The Executive Order and S. 289 are *per se* unconstitutional because they "ha[ve] the 'practical effect' of regulating commerce occurring wholly outside [Vermont's] borders." *Healy*, 491 U.S. at 332. As the FCC has long recognized, and as courts have confirmed, Internet access service is inherently interstate, and it is impossible or impracticable to separate Internet service into intrastate and interstate activities. *See, e.g.*, 2018 Order ¶¶ 199-200 (citing prior FCC orders). Under the "packet switching" approach that undergirds all Internet transmissions, content

is divided up into data packets that ISPs deliver by routing them over a variety of interconnected networks along dynamic paths without regard for state boundaries, which practically forecloses any effort to segregate intrastate from interstate Internet communications. Moreover, because the wireless signals that mobile ISPs use do not stop at state borders, the Executive Order and S. 289 also regulate extraterritorially when customers in Vermont with smartphones access the Internet by connecting to an antenna physically located in a neighboring state. Thus, "it is difficult, if not impossible, for a state to regulate internet activities without projecting its legislation into other States." *Am. Booksellers Found.*, 342 F.3d at 103 (invalidating a Vermont statute regulating the Internet because the "[I]nternet's geographic reach . . . makes state regulation impracticable").

58. The Executive Order also expressly purports to regulate commerce outside Vermont by prohibiting State agencies from contracting with an ISP that is non-compliant with respect to "any Internet customer" (or, as it is framed elsewhere in the Executive Order, any "customer," without further qualification), not just those residing or located in Vermont. *See* E.O. ¶¶ I.A-D. Each of these substantial extraterritorial effects plainly violates the dormant Commerce Clause. *See SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 193 (2d Cir. 2007) (recognizing extraterritoriality "as a basis for *per se* invalidity" under the dormant Commerce Clause).

59. The Executive Order and S. 289 independently violate the dormant Commerce Clause because they impose burdens on interstate commerce that are "excessive in relation to the putative local benefits" to Vermont. *Pike*, 397 U.S. at 142. As the FCC has found, the net neutrality requirements the Executive Order and S. 289 seek to re-impose place significant burdens on interstate commerce that outweigh any benefits those rules provide. *See* 2018 Order ¶¶ 239-266. For example, the Executive Order and S. 289 revive the FCC's Internet Conduct Standard, which the FCC repealed because it "subjects providers to substantial regulatory uncertainty" and

in turn led them to "forego or delay innovative service offerings . . . that benefit consumers," and because the "net benefit of the Internet Conduct Standard is *negative*." 2018 Order ¶¶ 246-249 (emphasis added). The Supreme Court has also warned against the burden imposed on interstate commerce caused "by subjecting activities to inconsistent regulations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88 (1987); *see also United Haulers*, 438 F.3d at 156-57 (recognizing "a regulatory requirement inconsistent with those of other states" as a "differential burden on interstate commerce"). In the context of the Internet in particular, compliance with a patchwork of inconsistent state laws is inherently burdensome and likely impossible.

60. Against these burdens, the State did not, and indeed cannot, identify any local benefits the Executive Order or S. 289 will provide, much less benefits that outweigh the heavy burdens imposed on interstate commerce—particularly in light of the 2018 Order's investment-friendly approach to open Internet principles. As described above, the 2018 Order implements detailed transparency requirements under which ISPs must clearly disclose their network practices and terms of service. ISPs must disclose blocking, throttling, paid prioritization, congestion management, and other network management practices and performance characteristics. 2018 Order ¶¶ 219-222. These disclosures enable consumers to choose between ISPs; moreover, ISP commitments and disclosures are fully enforceable by the FTC,[4] as well as state attorneys general (provided they enforce such commitments in a manner consistent with federal law). *See* 2018 Order ¶¶ 196, 244; *see also id.* ¶ 242. Beyond those transparency requirements, consumer protection and antitrust laws provide a backstop against any anti-competitive behavior. The FCC

[4] The FTC has authority under Section 5 of the FTC Act to take enforcement action challenging any "unfair or deceptive acts or practices." 15 U.S.C. § 45(a)(1).

found that these constraints "will significantly reduce the likelihood that ISPs will engage in actions that would harm consumers or competition." *Id.* ¶ 116.

61. In concluding that this "lighter touch" approach would protect consumers, while better promoting innovation and investment, the FCC found, based on its evaluation of the record evidence, that "ISPs have strong incentives to preserve Internet openness," *id.* ¶ 117, and that "there has been a shift toward ISPs resolving openness issues themselves with less and less need for Commission intervention," *id.* ¶ 242. In that vein, all of the Associations' members, either on their own or through their Associations, have made public commitments to abide by open Internet principles, which, as described above, are fully enforceable.

62. Both the Supreme Court and the Second Circuit have held that state regulations fail the dormant Commerce Clause's balancing test where, as here, the purported benefit "could be promoted as well with a lesser impact on interstate activities." *Nat'l Farmers Org. Irasburg v. Comm'r of Agric., State of Conn.*, 711 F.2d 1156, 1163 (2d Cir. 1983) (quoting *Pike*, 397 U.S. at 142). The Executive Order failed even to offer a factual basis for its claims that its provisions will benefit the State. And S. 289's bald and unsubstantiated assertion that the statute's "burden on interstate commerce" is "outweighed by the compelling interests the State advances," S. 289 § 1(21), plainly is insufficient to overcome the weight of precedent here. *See Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 530 (1959) (when "balanced against the clear burden on commerce," a state's "inconclusive" showing of benefit is insufficient to defeat a dormant Commerce Clause challenge).

63. Furthermore, courts have long recognized that the dormant Commerce Clause prevents states from "imped[ing] . . . the free flow of commerce" where there exists a "need of national uniformity." *S. Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 768 (1945);

*Morgan v. Commonwealth*, 328 U.S. 373, 386 (1946). The Second Circuit foresaw the very dilemma the Executive Order and S. 289 pose when it stated "that the internet will soon be seen as falling within the class of subjects that are protected from state regulation because they 'imperatively demand[] a single uniform rule.'" *Am. Booksellers Found.*, 342 F.3d at 104 (quoting *Cooley v. Bd. of Wardens*, 53 U.S. 299, 319 (1851)). As predicted, the Executive Order and S. 289 are but two threads in a tapestry of inconsistent, incongruous, and incompatible Internet access service regulations unified by a shared distaste for federal primacy and uniformity. The dormant Commerce Clause is a bulwark "against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 337. The Executive Order and S. 289 demand application of this constitutional bulwark here.

***Injury to the Associations' Members***

64. The Associations' members have bid on and/or obtained contracts with Vermont agencies in the past and intend to do so in the future. Indeed, since the Executive Order's signing in February, certain Association members have been in active negotiations with governmental entities in Vermont regarding the terms of broadband service contracts.

65. The Executive Order and S. 289 subject the Associations' members that bid on government contracts in Vermont to unconstitutional legal requirements—a significant injury in and of itself, and one that courts have found to be irreparable for purposes of issuing a permanent injunction. *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Christie*, 926 F. Supp. 2d 551, 578 (D.N.J. 2013) (holding that enactment of a law "in violation of the Supremacy Clause, alone, likely constitutes an irreparable harm requiring the issuance of a permanent injunction"), *aff'd sub nom. Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013). Indeed, the Executive Order broadly applies not just to the mass-market retail BIAS services that the 2015

Order subjected to net neutrality requirements, but to *all* broadband Internet services, including those sold to government and enterprise customers, which have *never* been subject to net neutrality requirements.

66. Moreover, the specific requirements that both the Executive Order and S. 289 impose will cause irreparable injury to the businesses of Associations' members that bid on and win state contracts. For instance, the 2018 Order makes clear that the Internet Conduct Standard, which the FCC specifically repealed but which the Executive Order and S. 289 purport to reinstate for Vermont ISPs, subjects ISPs (and their customers) to significant harm. *See* 2018 Order ¶¶ 246-52. This "vague Internet Conduct Standard subjects providers to substantial regulatory uncertainty," *id.* ¶ 247, as a result of which "ISPs and edge providers of all sizes have foregone and are likely to forgo or delay innovative service offerings or different pricing plans that benefit consumers, citing regulatory uncertainty under the Internet Conduct Standard in particular," *id.* ¶ 249. The loss of business opportunities caused by the application of and compliance with the Executive Order and S. 289 will therefore result in irreparable harm to the Associations' members. *Register.com Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (holding that the district court did not abuse its discretion in finding a permanent injunction necessary to prevent loss of business opportunities).

67. Members also will be subject to lost business opportunities if they do not accede to the unlawful conditions set forth in the Executive Order and S. 289, which prohibit non-compliant ISPs from entering into service contracts with governmental entities. Members thus face significant harm to the extent that they are prevented from offering services to State entities because of the Executive Order and S. 289.

68. More broadly, state measures like these that impose net neutrality requirements on ISPs "impair the provision of broadband Internet access service by requiring each ISP to comply with a patchwork of separate and potentially conflicting requirements across all the different jurisdictions in which it operates." 2018 Order ¶ 194. This harmful "patchwork" of state regulation has already become a reality. In addition to Vermont, five other states (Hawaii, Montana, New Jersey, New York, and Rhode Island) have issued executive orders establishing state-specific net neutrality obligations. Three other states (California, Washington, and Oregon) have enacted state-specific net neutrality legislation. There is significant variation among these state measures. For example, in contrast to the Executive Order and S. 289, which reinstate the FCC's repealed Internet Conduct Standard, the New York executive order imposes an entirely different catch-all provision prohibiting ISPs from "requir[ing] that end users pay different or higher rates to access specific types of content or applications." *See* New York EO-175 (signed Jan. 24, 2018), *available at* https://on.ny.gov/2LBkRGY. Because of the inherently interstate nature of the Internet, providers cannot apply Vermont's requirements to Internet packets as they move through Vermont, and then apply New York's requirements when those packets travel through New York. The provision of broadband Internet service is already being "impair[ed]" by the imposition of these separate and inconsistent state regulatory regimes. 2018 Order ¶ 194. And these sorts of variations will only multiply as other states enact net neutrality legislation, and different agencies and courts in different states interpret and enforce each state's requirements differently.

## FIRST CLAIM FOR RELIEF

***Executive Order No. 2-18 and S. 289 Are Preempted by Federal Law***

69. The allegations of paragraphs 1 through 68 above are incorporated as though fully set forth herein.

70. The Executive Order and S. 289 are expressly preempted by the 2018 Order and the Communications Act. Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, state laws that contravene validly enacted federal laws are preempted and have no force or effect. The Executive Order and S. 289 contravene binding federal law and policy as set forth in the 2018 Order and the Communications Act and are therefore preempted.

71. The 2018 Order expressly "preempt[s] *any* state or local measures that would effectively impose rules or requirements that [the FCC has] repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for *any aspect* of broadband service" addressed in the 2018 Order. 2018 Order ¶ 195 (emphases added).

72. The Executive Order and S. 289 plainly fall within the scope of this express preemption provision. They are state measures that seek to reinstate net neutrality requirements that the 2018 Order repealed. And the Executive Order imposes more stringent requirements by expanding those obligations to a larger set of providers and services than the repealed federal regulations covered, by extending to all broadband Internet services (including enterprise offerings sold to government entities and large businesses that the FCC decided not to regulate), not just mass-market offerings. The Executive Order and S. 289 also are subject to conflict preemption because they stand as an obstacle to the federal policy of reducing regulation of broadband Internet services.

73. In addition, the 2018 Order reclassifies BIAS as an information service and mobile BIAS as a private mobile services, both of which are exempt from common carrier regulation

under the Communications Act. By basing their requirements on standards formerly predicated on classifying BIAS as a common carrier telecommunications service, the Executive Order and S. 289 impose common carrier regulation on ISPs in violation of the express terms of the federal Communications Act and federal policy and are therefore preempted for that reason as well.

74. As explained above, binding precedent holds that a state may not use its spending power as a means to regulate indirectly what it cannot regulate directly. Nor can a state escape preemption by claiming it is acting as a market participant where, as here, the challenged measure aims to reach conduct wholly outside the scope of a state contract, including by regulating the provision of service to all customers throughout the state.

75. The Executive Order and S. 289 subject the Associations' members to significant and irreparable harm by imposing unconstitutional requirements on members, causing members to lose business opportunities, and impairing members' services by exposing them to a patchwork of inconsistent regulation.

76. Vermont's enforcement of the Executive Order and S. 289 will deprive the Associations' members of their rights under the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF

### *Executive Order No. 2-18 and S. 289 Violate the Dormant Commerce Clause*

77. The allegations of paragraphs 1 through 76 above are incorporated as though fully set forth herein.

78. The Executive Order and S. 289 violate the Commerce Clause of the United States Constitution, art. I, § 8, cl. 3.

79. The Executive Order and S. 289 are state measures that regulate conduct occurring outside the borders of the State. The Executive Order and S. 289 also impose burdens on interstate commerce that are not justified by putative in-state benefits. Binding precedent holds that such state regulations are invalid under the Commerce Clause.

80. The Executive Order and S. 289 subject the Associations' members to significant and irreparable harm—by imposing unconstitutional requirements on members, causing members to lose business opportunities, and impairing members' services by exposing them to a patchwork of inconsistent regulation.

81. Vermont's enforcement of the Executive Order and S. 289 will deprive the Associations' members of their rights under the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

1. A declaration and judgment pursuant to 28 U.S.C. § 2201 that Vermont Executive Order No. 2-18 and S. 289 are preempted by federal law.

2. A declaration and judgment pursuant to 28 U.S.C. § 2201 that Vermont Executive Order No. 2-18 and S. 289 violate the Commerce Clause.

3. An order permanently enjoining Defendants from enforcing or giving effect to Vermont Executive Order No. 2-18 and S. 289.

4. An award of reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

5. Such further relief as the Court deems just and equitable.

Dated: October 18, 2018

Respectfully submitted,

David M. Pocius
PAUL FRANK + COLLINS P.C.
P.O. Box 1307
Burlington, VT 05402-1307
(802) 881-0828
dpocius@pfclaw.com

*Attorney for Plaintiffs American Cable Association, CTIA – The Wireless Association, NCTA – The Internet & Television Association, New England Cable & Telecommunications Association, and USTelecom – The Broadband Association*

Scott H. Angstreich*
Brendan J. Crimmins*
Rachel Proctor May*
KELLOGG, HANSEN, TODD, FIGEL, & FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
(202) 326-7900
sangstreich@kellogghansen.com
bcrimmins@kellogghansen.com
rmay@kellogghansen.com

*Attorneys for Plaintiffs CTIA – The Wireless Association and USTelecom – The Broadband Association*

Jeffrey A. Lamken*
MOLOLAMKEN LLP
The Watergate, Suite 600
600 New Hampshire Ave., NW
Washington, DC 20037
(202) 556-2000
jlamken@mololamken.com

*Attorney for Plaintiff American Cable Association*

Matthew A. Brill*
Matthew T. Murchison*
Adam J. Tuetken*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.brill@lw.com
matthew.murchison@lw.com
adam.tuetken@lw.com

*Attorneys for Plaintiffs NCTA – The Internet & Television Association and New England Cable & Telecommunications Association*

**Pro hac vice* motion to be filed